THE STATE EX REL. FLORENCE H. FUNK v. BEN H. TURNER and AMERICAN SURETY COMPANY OF NEW YORK, Appellants.—42 S. W. (2d) 594.

Division Two, October 1, 1931.*

---

*NOTE: Opinion filed March 25, 1931; motion for rehearing overruled July 3, 1931, former opinion withdrawn and new and additional opinion filed; motion to transfer to Court en Banc overruled October 1, 1931.

*Bryan, Williams, Cave & McPheeters* for appellants.

*Higbee & Mills, J. M. Campbell* and *M. D. Campbell* for respondent.

608

WESTHUES, C.—This cause was certified to this court by the Kansas City Court of Appeals, because of a dissenting opinion in that court. [17 S. W. (2d) 993.]

The case was submitted to this court at the January, 1931, call of the October term, 1930. In the original opinion filed prior to our April term, we adopted *in toto,* as our opinion, the majority opinion of the Kansas City Court of Appeals, reported in 17 S. W. (2d) 986.

In the motion for rehearing the respondent has many complaints to make with reference to the opinion. We have concluded that we can more conveniently dispose of the issues presented if we cast aside our former opinion and rewrite the case. We are taking the motion for rehearing as part of respondent's brief. Our former opinion, prepared by the present writer, is therefore withdrawn.

The suit was brought in the name of the State to the use of plaintiff against the defendants on the official bond of defendant Turner, a bank examiner. The defendant, American Surety Company of New York, being the surety on the bond.

The amended petition is in part as follows:

"AMENDED PETITION.

"Plaintiff states the defendant, American Surety Company of New York, now is, and at all of the times in this petition mentioned was, a corporation organized as such and authorized to and engaged in the business of becoming surety upon official bonds in the State of Missouri; that during the entire year of 1919 Charles F. Enright was the duly appointed, qualified and acting Bank Commissioner in and for the State of Missouri; that on the 19th day of October, 1919, the defendant Ben E. Turner, was appointed Bank Examiner for the State of Missouri under said Charles F. Enright, and then and there immediately took the oath of office as Bank Examiner, and then and there on that day, to-wit, October 10, 1919, said Ben E. Turner, as principal, and the defendant, American Surety Company

of New York as surety, executed an instrument of writing in which it is recited that the said Ben E. Turner, as principal, and the said American Surety Company of New York, as surety, are held and firmly bound unto the State of Missouri in the full sum of $10,000, for the payment of which, well and truly to be made, they have bound themselves, their heirs, successors and assigns, jointly and severally, and that the said Ben E. Turner, therein named as principal, had been duly appointed Bank Examiner in and for the State of Missouri for a term beginning October 10, 1919, and in said instrument it is further recited that the condition of said obligation is such that if the said Ben E. Turner shall faithfully and impartially discharge the duties of his office and pay over to the persons entitled by law to receive the same all moneys coming into his hands by virtue of his office, then said obligation to be void, otherwise to be and remain in full force and virtue.

"That said Ben E. Turner then and there entered upon the performance of his duties as Bank Examiner and continued to be Bank Examiner of the State of Missouri until the —— day of ————, 1920. That prior to the 1st day of March, 1918, the secretary of the Kirksville Trust Company of Kirksville, Missouri, had embezzled, secreted and made way with more than one hundred thousand dollars of money theretofore deposited in said Kirksville Trust Company by its various depositors, and that the records and books of said Kirksville Trust Company revealed that fact; that on said 1st day of March, 1918, and at all times thereafter until it closed, the said Kirksville Trust Company was utterly insolvent, and thereafter the said secretary of said Kirksville Trust Company continued embezzlement of the funds of said depositors of said trust company from time to time until at the time it closed the amount embezzled was the sum of over four hundred thousand dollars; that said Kirksville Trust Company of Kirksville, Missouri, was a banking corporation, organized under the laws of Missouri relating to banks and trust companies, with an authorized capital of one hundred thousand dollars, fifty thousand dollars of which was paid up, and doing a banking business in the city of Kirksville, Missouri; that the said Ben E. Turner did not faithfully perform his duties as Bank Examiner in this: That during his entire term of Bank Examiner, and at all times thereafter, said trust company was utterly insolvent; that on the 31st day of October, 1919, said Ben E. Turner, as Bank Examiner, examined said Kirksville Trust Company, its business and affairs and made report thereof; that on said October 31, 1919, more than two hundred and fifty thousand dollars of money theretofore deposited with said Kirksville Trust Company by its customers had been embezzled, secreted and made way with, and said Kirksville

Trust Company did not have a surplus in any sum whatever, and that the same was then and there utterly and hopelessly insolvent.

"That on said October 31, 1919, and during the examination of the affairs of said Kirksville Trust Company, its books and records, the said Ben E. Turner discovered and did then and there know that said Kirksville Trust Company was utterly and hopelessly insolvent; that money deposited with it by its customers, as aforesaid, had been embezzled, secreted and made way with; that it had no surplus, or if the said Ben E. Turner had at said time made a reasonably careful examination of the records, books and affairs of said Kirksville Trust Company he would have discovered that said Kirksville Trust Company was utterly and hopelessly insolvent, that it had no surplus; that more than two hundred and fifty thousand dollars of money deposited with it by its customers had been embezzled, secreted and made way with, and that the continuance in business of said trust company would seriously jeopardize its depositors; that if the said Ben E. Turner had made a reasonably careful examination of the records, books and affairs of said trust company, and had reported the facts so revealed by said records to the Bank Commissioner of the State of Missouri, said trust company would have been immediately closed; that the said Ben E. Turner then and there did make report to the Bank Commissioner of Missouri, and that he did not state in said report that said Kirksville Trust Company was insolvent, nor did he report, that any of its funds had been embezzled, secreted or made way with, or that its continuance in business would seriously jeopardize its depositors, but did report to said Bank Commissioner that said trust company was efficiently managed."

Plaintiff then states that on March 19, 1923, the Finance Commissioner took charge of the affairs and the assets of the Trust Company and proceeded to liquidate the same.

Plaintiff further alleges that she made various deposits in the Trust Company beginning October 29, 1921, leaving a balance of $9,256.53 to her credit on the date the company was taken over by the Finance Department. Plaintiff further pleads that all but $1,666.17 was received by her as dividends during the process of liquidation. Plaintiff then asks judgment for the penalty of the bond, to be satisfied on the payment of $1,666.17, interest and cost.

The defendants filed separate answers consisting of a general denial, the Statute of Limitation, and the plea that plaintiff is prosecuting two separate causes of action inconsistent with each other.

The cause was tried before the court sitting as a jury. A judgment was entered for plaintiff as prayed for in the petition. Plaintiff's evidence is substantially as follows: Florence H. Funk, plaintiff, testifying in her own behalf, identified her pass-books showing

her account with the Trust Company. This account showed a balance to plaintiff's credit March 19, 1923, as stated in the petition. Plaintiff further testified substantially as follows: That at all times while she dealt with the Trust Company, she had implicit confidence in the men in charge of the bank. That she knew the directors personally, also the cashier or secretary. She believed these men were honest and capable and that they were personally handling the affairs of the bank. She further testified she did not own any stock in the company, neither was she at any time an officer of the company, and had no knowledge of the affairs or the financial conditions of the bank.

E. G. H. Kessler, a certified public accountant, testified that he examined and made a complete audit of the books and records of the Trust Company during the month of August, 1923. That his examination covered a period of from February 28, 1917, to March 17, 1923. This examination was made from the books of the company produced by the Finance Commissioner in charge of the affairs at that time. The witness found shortages as follows: February 28, 1917, $94,914.50; January, 1920, $259,809.07. The shortages continued to increase, and on March 17, 1923, the last business day, they totaled $415,497.75. The shortages were calculated on the theory that the notes held by the bank were worth their face value. These shortages according to the witness appeared in the savings account, which account on January 19, 1920, showed $77,929.83 in the general book, while the total savings deposits according to the savings deposit ledger amounted to $337,736.92. The witness further testified that from an examination of the records he discovered an attempt on the part of some officer of the Trust Company to cover up shortages. That he discovered numerous erasures and changes in the figures on the daily statement book. This was general throughout the years for which he made the audit. He further testified that he discovered two hundred instances where the books showed that the money was taken and the cash did not go into the resources of the bank. These two hundred items disclosed a shortage of $276,-000. He further testified that the daily statements published in the newspapers were not in accord with the books kept by the bank. This, however, occurred after February, 1921.

E. B. Campbell testified that he was the Deputy Commissioner in charge of the Trust Company for the purpose of liquidation. This witness testified as to the amounts realized on the various notes that came into his possession, and the solvency or insolvency of the makers of the notes. There were also introduced in evidence four exhibits, being reports of examinations made by the bank examiners to the Finance Commissioner as to their findings, and the condition of the Trust Company. One of these reports dated March 23, 1918,

was prepared by an examiner by the name of George W. Hobbs. The second dated November 27, 1918, was made by an examiner named James T. Duncan. The next dated October 30, 1919, was made by the defendant Ben E. Turner, and the next dated October 21, 1920, was also made by Ben E. Turner.

Two witnesses, Ethel Conner and N. E. Winn, testified that they made an examination of the various reports of the bank examiners, introduced in evidence, and testified that in their opinion the Kirksville Trust Company was insolvent at the time these reports were made, and that the reports themselves reflected that condition.

We also gather from the testimony that the cashier or secretary of the company embezzled the money found to be short. That four hundred and thirty-five thousand dollars was collected from the life insurance policies on the life of this secretary. This sum was used to pay the dividend of about eighty-five per cent to the claimants.

At the close of plaintiff's testimony, and again at the close of the whole case, the defendants offered, and the court refused, an instruction in the nature of a demurrer to the evidence. The instruction is as follows:

"The court finds that under the pleadings, the law and the evidence in this case, the finding and judgment of the court is for the defendant."

This ruling of the court is assigned as error in the motion for new trial, and also in defendant's brief. Let us first dispose of this demurrer offered at the close of the whole case.

There is no evidence whatever in this record to sustain the allegation of the petition that defendant Turner discovered or knew that the Trust Company was insolvent. The evidence of witnesses Conner and Winn, that in their judgment it was insolvent, based on the reports of the examiners, including Turner, is no evidence that Turner or the Bank Commissioner were of the same opinion. The solvency or insolvency of a bank is a question upon which reasonable minds may differ. The Commissioner or examiner is not liable for an error in judgment in this regard. [State v. Title Guaranty & Surety Company, 152 Pac. 1. c. 192 (4); Deatsch v. Fairfield, 233 Pac. (Ariz.) l. c. 893 (8), 22 R. C. L. 485, sec. 163; 29 Cyc. 1443.]

If plaintiff is entitled to recover in this case, it must be upon the allegation of the petition and the evidence, if any, in support thereof, that Turner did not make a reasonably careful examination of the records of the bank and therefore was negligent, and as a result failed to discover that the secretary of the company had embezzled a sum of money of sufficient amount that would have shown the bank to be unquestionably insolvent.

The evidence reveals that the books of the bank examined by Kessler, at the time it was taken over by the Finance Department in March, 1923, showed the embezzlements were of a sum sufficient, when Turner made his examinations, as to render the bank hopelessly insolvent. We may also add that, except for the shortage caused by the embezzlement, it is questionable if the bank was insolvent at the time Turner made his examinations. The Bank Commissioner, the examiners, and the board of directors of the company, who knew and understood the conditions (except the embezzlements) considered the company solvent.

Turner made two examinations: the first, October 30, 1919; the second, October 21, 1920. Plaintiff testified that all of the sums sued for in her petition were deposited with the company after October 29, 1921, one year after the last examination made by Turner. The examination of October, 1920, must therefore be the basis of plaintiff's recovery.

Defendant's theory is that even though defendant Turner was negligent in making his examination, yet plaintiff is not entitled to recover (his duties being discretionary), unless he acted willfully, maliciously, or corruptly. Plaintiff's theory is that mere negligence is sufficient.

The difficulty arises in the classification of the duties of a bank examiner, whether discretionary or ministerial. To solve this question we must refer to Section 11689, Revised Statutes 1919. This section makes it mandatory that every bank be examined at least once a year. Additional examinations may be made when deemed necessary in the judgment of the Commissioner. The section further provides:

"On every such examination inquiry *shall* be made as to the condition and resources of such corporation or banker, the mode of conducting and managing its affairs, the actions of its directors or trustees if a corporation, the investment of its funds, the safety and prudence of its management, the security afforded to those by whom its engagements are held, and whether the requirements of its charter and law have been complied with in the administration of its affairs; and as to such other matters as the commissioner may prescribe. The commissioner may also make such special investigations as he shall deem necessary to determine whether any individual or corporation has violated any of the provisions of this chapter. Such examination may be made and such inquiry instituted or continued in the discretion of the commissioner after he has taken possession of the property and business of any such corporation or banker, until it shall resume business or its affairs shall be finally liquidated in accordance with the provisions of this article."

By the provisions of this section the Commissioner must make at

least one examination each year. That duty is not a discretionary one, but is ministerial; he has no alternative or choice in the matter. The same section leaves it to the judgment of the Commissioner to make additional examinations. Therefore, that becomes a discretionary duty to be performed whenever in the sound judgment of the Commissioner it becomes necessary. We are also of the opinion that the section makes it the mandatory duty of the officer, who conducts the examination, to make inquiry into the various matters set out in the statute. Since it is mandatory it becomes a ministerial duty, the examiner must make the inquiry with reference to the various matters set forth in the statute. What are ministerial duties? [See 29 Cyc. 1442; 46 C. J. 1036; Discretionary, 29 Cyc. 1443.] The Commissioner is also given authority to direct an inquiry into other matters not specified. A haphazard examination by an examiner into the matters required by the statute is not sufficient. Where a statute requires an act to be done it must be performed with a reasonable degree of diligence, care, and prudence. Failure to so perform that duty is in law negligence. [46 C. J. 1036, sec. 305.]

We have come to the conclusion, however, as stated in our former opinion, that the length of time that shall be occupied in the examination, and the character and extent of the examination, are left, as a matter of necessity, to the discretion of the Banking Department. A reading of Chapter 108, Revised Statutes 1919, now Chapter 34, Revised Statutes 1929, convinces us that the lawmakers never intended the Banking Department, through the examiners, to make a complete audit each year of the various banks of the State. This would, with the number of examiners provided for, be an impossibility. In State v. Title Guaranty & Surety Co., 152 Pac. (Idaho) l. c. 192 (4), the court said:

"The law invests the Bank Commissioner with discretion while he is making his investigation and up to the point where he reaches the conclusion and becomes satisfied that the bank has unlawfully refused to pay its depositors or has become insolvent, but at this point his discretion ends, and it becomes his mandatory duty to close it, a duty the failure to perform which renders him and the surety upon his official bond liable to depositors who lose their money as a direct result thereof. [State v. American Surety Co., 26 Ida. 652, 145 Pac. 1097.]"

See also Deatsch v. Fairfield, 233 Pac. (Ariz.) l. c. 892, 893. In the later case it developed that the bank was actually insolvent at the time the examination was made. The Comptroller was not held liable on his bond. The court said: "The Comptroller, in passing upon the question as to whether a bank is solvent or not, exercises judgment and discretion, *and it is not until he has determined the bank to be insolvent* that he acts ministerially and becomes liable on his bond

for dereliction of duty." (Italics ours.) The statutes of those states, with reference to the duties of the Banking Department, are similar to ours.

We will now examine the report of the defendant, Turner's examination, dated October, 1920, and see if he made an examination as required by the statute. The report is plaintiff's exhibit eight. From it we learn that the examination commenced at nine A. M. October 21st and closed at four P. M. October 23rd. The resources and liabilities of the bank are listed, both totaling $437,626.74. In the resources we find cash items $15,155.98. Among the liabilities are listed the capital stock of $50,000; surplus, $7,000; savings deposits, $45,389.11. Next the names of the officers and directors and their liabilities to the bank and the number of shares of the Trust Company owned by each. A notation here criticises the minutes of the directors' meetings. Another notation refers to the officers as being capable, prudent, and of excellent reputation, and their management good, with the exception of the note case. Necessary books are used and promptly and properly posted. Ledgers accounts are verified and reconciled at least monthly. Then the loans and discounts are listed and separate notations made of Class G and H paper. Class G represents paper due more than six months: It amounted to $10,-467.88. Class H papers due more than thirty days, amounted to $4,864.90. This paper is then listed with the names of the makers, dates when due, the amount, and a notation whether good, bad, or doubtful. A severe criticism is then found in the report, of the neglect in collecting past due paper. Also a notation that the board of directors had personally guaranteed in writing a note of R. W. Miller & Company for $11,150. This had been required by the Banking Department on the recommendation of a bank examiner, who had previously examined the bank. Next we find the amounts due from other banks and the rate of interest received thereon. A comment is made with reference to the cash items. In the report they are considered regular, consisting mostly of items of local exchange. We also find among the resources a house and eight lots in Adrain, Minn., carried at $3,350, estimated value at $5,000; also $9,000 second mortgages, taken to secure previous debts. Under the liabilities we find that the company declared a dividend of $5,000 May 20, 1920, and carried to surplus $500. We find listed the amounts due other banks and the accounts of the Treasurer of Adair County, the City Treasurer of Kirksville, and the rate of interest paid thereon. The report then criticises the method of doing business, particularly the failure to collect past due notes. It concludes with a lengthy list of questions and answers, under oath, of four members of the board of directors, with reference to the affairs of the bank.

We have carefully compared this report with the reports of ex-

aminations made by Hobbs and Duncan in March and November, 1918, being plaintiff's exhibits five and six. We find this report substantially the same and in harmony with those reports. The figures and accounts of course vary with the conditions at the time. We have scanned the record carefully and do not find any evidence tending to prove that the report made by Turner in October, 1920, did not correctly, accurately and in good faith report the condition of the bank at that time (except the embezzlement). Nor is there any evidence that Turner did not make the usual and ordinary examination made by bank examiners.

We are of the opinion that in making this examination, Turner performed his duties in substantial compliance with the requirements of the statute. An examiner is not required under the statute to make a complete audit of the books of the bank. Neither is he required to call in the pass books of the customers and verify them with the records, or to call upon the makers of the notes to determine their authenticity. True, the banking department has the power to do so, and if deemed necessary, the Commissioner may order a complete audit. An audit of the books should reveal any shortages in the various accounts. An audit may report the books to be in perfect balance, and yet the bank, its notes being worthless, be hopelessly insolvent. The duties of the Banking Department are of a different nature. They must, as the statute specifies, make inquiry, and find if the board of directors are performing their duties with reference to making loans and other matters; if over-loans have been made; if the officers are bonded; if the funds are invested in good security as required by law; and make inquiry as to the solvency of the makers of notes held by the bank; in general to see that the banks are conducting their business according to law and the rules of the department. If in the course of this examination an examiner discovers a shortage he must make inquiry of its extent and report the same to the Bank Commissioner. The mere failure to discover a shortage does not necessarily mean that the examiner failed to make an examination as required by the statute.

The plaintiff's theory is that if defendant Turner had made a careful examination he would have discovered the shortage. In the motion for rehearing we read: "If he [Turner] did not see and did not know [of the shortage] he was not only blind, but lacking in ordinary comprehension." We also find in the motion for rehearing the following: "It is said in the opinion that these embezzlements were not discovered 'because of certain changes and manipulations of the books and accounts by means of which the shortage was covered up.' There is no evidence to justify this assertion except the evidence that erasures appeared upon the books." This assertion referred to in the motion for rehearing was based on the

following testimony by plaintiff's witness, Kessler, who made the audit in 1923. "I haven't anything to show the condition of that institution on the 30th day of November, 1918, on the 30th day of October, 1919, or on the 23rd day of October, 1920. From my examination of the records that were, given to me I discovered an attempt on the part of some officer of the trust company to cover up shortages. The daily statement book clearly shows the erasures and changes in figures. That was rather general throughout the years I made the audit. . . . There were so many instances of the covering-up process like the illustration I gave of Stephen M. Payne's account, that I couldn't venture a guess as to their number." The plaintiff also introduced in evidence exhibits five and six above referred to, being reports of examinations made of this bank in March and November, 1918, by Hobbs and Duncan, examiners. No shortage or embezzlement is reported in either of these reports. Kessler's audit, made in 1923, revealed that there was a shortage, at the time of the Hobbs and Duncan examinations, in excess of one hundred thousand dollars, yet, neither Hobbs nor Duncan discovered any shortage. They examined the books of the bank in the same capacity as did Turner. Bank examiners are not always able to detect embezzlements when the embezzler is cashier and also has complete charge of the books. [Arndt v. Frye, 20 S. W. (2d) l. c. 924.] In the case at hand the embezzler had charge of the bank and also the books. Kessler, plaintiff's witness, testified that the books he examined were complete and sufficient to show the condition of the bank, but he did not know whether the cashier had any other books than those he examined. Is it reasonable to suppose that the embezzler would keep the books of the bank in such condition that a bank examiner would readily discover his peculations? Or is it more in harmony with common experience that embezzlers cover up their wrongdoing as long as possible? Plaintiff's witness testified, as above quoted, that he discovered an attempt to cover up shortages. The shortage was found to be in the savings deposits. This account as per the savings deposit ledger, examined by Kessler, amounted to $211,102.71 on February 28, 1917, and on January 19, 1920, to $337,736.93. The general book showed the savings account on February 28, 1917, to be $116,188.21, and on January 19, 1920, $77,929.23. In Examiner Hobbs's report, made on March 23, 1918, the savings account is reported as $121,494.39. Duncan's report, dated November 30, 1918, showed the item as $86,934.26. Turner's report, of October 30, 1919, showed the item as $67,730.61, and in his report of October 21, 1920, as $45,398.11. Plaintiff's exhibit fifteen is a report of a stockholder's committee, made under oath, wherein they state that a full and thorough examination was made of the books, papers, loans, etc., of the bank, on the 23rd day of July, 1920. In this report the item

of savings deposits is $55,189.07. No shortage was discovered. This evidence lends credit to the theory that the shortage was covered up, and the books showing the shortage never submitted to the examiners in a condition so as to reveal the shortage. In our former opinion we said that the shortages were not discovered because of certain changes and manipulations of the books and the accounts of the bank, by which the embezzlements were covered up. This statement was based on plaintiff's testimony. After reconsidering the evidence we are constrained to adhere to that statement.

While the evidence is sufficient to show that a complete audit, or a verification of the customer's pass-books with the books of the bank, would have revealed the embezzlement; there is no evidence in this record to show that the bank's books, examined by Turner, were in such condition at the time Turner made the examination in 1920, that he could have discovered the shortage in making the usual examination made by bank examiners. In this case the only evidence introduced to prove negligence is the evidence that the books in 1923 disclosed a shortage to have existed since 1917. The bank continued to operate more than two years after Turner's examination. If the Banking Department performed its duty (and this we may presume, 22 R. C. L. 473) at least two examinations were made after Turner's, and no shortage detected. The position of the officers of the Banking Department would indeed be a perilous one if they were to be held liable to all subsequent depositors after an examination, on the mere showing of a complete audit, which disclosed forgeries or embezzlements to have existed at the time the examination was made. It would be unwise and unjust to establish such a rule of law. We hold no substantial evidence was offered to prove defendant Turner was negligent in performing any ministerial duty imposed upon him by the statute. The demurrer to the evidence at the close of the case should have been sustained.

Plaintiff undoubtedly introduced all available testimony favorable to her claim. We see no good reason for remanding the case. The conclusion we have reached makes it unnecessary to consider other questions presented.

The judgment of the circuit court is reversed and the motion for rehearing overruled. *Cooley, C.,* not sitting; *Fitzsimmons, C.,* concurs.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All of the judges concur.